Call the next case, please. Case number 090959, Calumet City Liquor License Association and all, vs. Michelle Qualkinbush and all. I wonder if the attorneys who were going to orally argue would step up and identify yourselves for the record. Good morning, Your Honors. Robert Weber on behalf of the appellate. Good morning, Your Honors. Michael Hayes on behalf of the defendant's sample leads. Mr. Weber, Mr. Hayes, I think you're both familiar with the appellate court practices. You have 15 minutes, out of which you may save a few minutes for a response. And I think you can safely assume that we're familiar with your briefs. And you can proceed, Mr. Weber, whenever you're ready. Your Honors, this case arises from defendants implementing a plan to close or purchase taverns within Calumet City. I thought it was just changing hours. Well, the ordinance in question changed the hours. The ordinance was part of a plan that was You keep referring to a plan. Is there a writing someplace that we can read? No. Is there a writing in the record that says we have a plan to close these taverns? No. And the way we're going to go about it is that we're going to strangle them economically so that they're forced to deal with us. No, there is not. And I would refer, Your Honors, to I believe You use capital letters throughout your brief. Because it's a defined term. I defined the term in the beginning. I understand that. Is the removal plan somehow fraudulent or untoward or illegal or what? Well, I believe it's all of those. Okay. Do you have to plead fraud with specificity? Yes. In general, you plead fraud with specificity. But the plan here is evidenced by number one What's your best count? Do you agree that really there's one count that's stronger than the others? I mean, First Amendment association rights because you can't drink for two hours? What case could you possibly support for that one? Let's take that one first. The Galt case. The what? The Galt. Galt case. And tell me about Galt. Did that involve the right of association to continue drinking? No. No. Galt dealt with the Cook County exercising its zoning power to set aside land for a subsequent acquisition for the widening of North Avenue. They used their zoning power, which everybody agrees they had the right to. You're saying that's a First Amendment association case. No, I'm not. I want you to explain to me what is the First Amendment core here about drinking from 12 to 2? That is what I need to know. Okay. I missed the First Amendment in your question. Okay. That's what I want to know. Do we get rid of that count or do you truly believe that's your best count? No, I'm not saying that's the best count. I think that probably count two, which is the due process count, is the best. Substantive due process. Correct. When you're really talking about it, will you consider an instance of spot zoning? You cited the Davis case for the line of cases that says, you know, the purposely depressed property values in anticipation of future land acquisition. If you can prove that, you've got a cause of action. Yes. All right. If you can prove that. Now, do you have to plead it? I believe I pled. Do you think you've pled it when you say that this is what we used to make, this is what we make now, the building was worth whatever. That allegation, you know, if we really looked at it, it is conclusory, and then the next allegation is now it's worth this. Okay. There's really no facts at all. You need a smoking gun, don't you, to really make that, to give some weight to that argument? And the smoking gun would be maybe the minutes of the discussion among the mayor and the alderman and the alder ladies about their real reason for reducing the time. Which would be the executive session that they had before they passed the ordinance. Yeah, the minutes of the executive session. This is a pleading case. We haven't gotten to discovery. I understand that. You haven't gotten to discovery. What was in there besides the main, I mean, what is the removal plan? Just simply to get rid of taverns in general that are in the residential areas? The removal plan is to get rid of taverns that are adjacent to or in residential areas which are zoned properly or legal nonconforming uses without paying just compensation for them. Because you could eminent, I mean, they have the power of eminent. Absolutely. They can come in any time and close them all. Absolutely. But they aren't doing that. We have pled that there was a meeting, an agreement, between the mayor and her staff, the other alderman, and as a result of that meeting, the mayor called in some of my clients and others and offered to buy their places and said, if you don't sell them, we're going to get them anyway. And I'm not paying you just compensation for them. Did she say, I'm not paying you just compensation? Or does your allegation say that she said, we're not going to pay any more than $100,000 for any tavern? Yes. That's correct. She said that, but the taverns are worth more than that, so I am taking a reasonable inference from that statement. Okay. Mr. Weber, how do we really know from your pleading that those taverns are worth anything? Unless they're making a few hundred bucks a week. Because the Some made $250, some made $500 after, some made whatever. And then you say that the values went down from 207 to 209. In any case, the owner of property has the right to come in and testify as to its value. He is competent. No problem with that. But you have to plead it. You've got to plead facts, not conclusions. It's in the pleading as to what they were worth and the depreciation in value. But you don't base it on any facts. You say it's worth this. In 2007, it was worth this amount. No basis, no factual support at all. That's a conclusion. Then you say, and now it's worth this. And you don't say why, except you say because we don't have these two hours. These are ultimate facts that I have pled. We are at the pleading stage. When we get to the proof, I do not have to put evidence in my pleading. You have to plead facts, not conclusions. I can plead factual conclusions, which I have pled. I do not have to plead evidence. I have pled that these properties were depreciated in value by X hundreds or thousands of dollars. Tell me, what was it that the judge, why did he not allow you to plead again? Three times you came with these basic facts. What was his reasoning? I believe I set it out in my initial brief as to, he made some factual mistakes, but I think when it comes right down to it, he felt that as long as the village had the power to regulate hours, anything it did in that area was sufficient and that there was no way I could prove. Now, I think that that's not really what he said. I think he said that you have not gone beyond what you're required to do, that when we inquire into generally legislative acts, in order to get past a reason for that legislation, that we need more than simply saying, well, there was a removal plan. You have to plead specific facts, like amounting to, say, a fraud. Now, in the case where the alder person got $50,000, there wasn't any written agreement, and I'm not saying you need any written agreement, but didn't the court say that you had not pled anything that would amount to something more than, I'll support your legislative agendas if you support my plan to get rid of or shorten the hours of these taverns that are in residential areas? I respectfully submit the judge was wrong. The trial judge was wrong. What we have pled here is an agreement, and the agreement, and before it was implemented, was verbalized by the actions of the mayor in negotiating without an ordinance, without a plan, and with threats. Then when there was a refusal on our part, she then threatened some more. Then they passed the legislation, Ordinance 07-42, which discriminated, as far as hours were concerned, between taverns, and then we look at the result, and this is what I think the trial judge was saying. You didn't give me anything before, and what has happened? So we gave him the statements before, albeit nothing's in writing, nothing like this will be in writing. Let me ask you this, Mr. Weber. Is it enough? Now, initially, there was some suggestion that she lives next to a tavern, and her house was right next to one of these 2 o'clock licenses. Correct. And she didn't like the idea that there was noise and whatever else coming from those taverns. Now, let's assume, is there anything wrong with the mayor and the older people deciding that they could cut down on the time of those licenses? No, not if they do it for everybody. Okay. Well, didn't they do that for all the taverns? No. No. That's part of the problem. Not all 52? No, absolutely not. Some of them. Not the ones with entertainment. I'm not talking about taverns with entertainment. Now, taverns with entertainment doesn't mean that they have entertainment. I understand that. Okay. They are taverns. They have a bowling alley. Yeah, yeah, yeah. No, there is a difference between a bowling alley and your kind of tavern, isn't there? No, it's a tavern. There's only one bowling alley. Are there 2 now that have? No, one. One. Okay. Now, so, is there anything wrong with the mayor wanting to cut the hours of the taverns that don't have entertainment? Or desire? No, nothing wrong with that. It's what your, the gist is that they were trying to do this without giving the tavern owners compensation, just compensation for those taverns. The way they did it, correct. The way they did it, they should have made provision for compensation, or they should have done it across the board where everybody was treated the same. Okay. Now, tell me why the 52 taverns that have the 2 o'clock, or that had 2 o'clock and now close at 12 aren't all the same. Aren't they all in the residential areas? Aren't those the taverns that have to cut hours? No, no, no. I think we are talking about. Is there a single tavern with entertainment that's a party to this lawsuit? Is there a single tavern without entertainment or with entertainment? With entertainment. No. No. Because they have the 2 o'clock license. All of the plaintiffs in this suit are taverns in residential areas, aren't they? They are either adjacent to, which means they're zoned properly for a tavern. Yeah. Or they're legal nonconforming uses within a residential zone, and there are ways to eliminate those if you have the mayor's desire to eliminate taverns in or adjacent to residential zones. There are legal ways of doing it. Okay. You're saying that they're treating some of these taverns differently? They all have to close at midnight. No, they don't. The taverns with the E figure get to remain open. The E figure is the entertainment. Right. Even though they may not have entertainment. All they're doing is paying an extra fee. How many of those are there? There are eight. They're paying an extra fee. They're paying. I'm sorry, there's 12. 12 of them. Paying more for that. Two were added after this controversy started. Okay. And they're paying more for those licenses, aren't they? Right. And we'll pay more for them. Our people would pay more for them. It isn't the money. So you're saying that basically your cause of action is that they're attempting to take these taverns without compensation? Yes, they are denying our substantive due process because the plan that they have put into effect has no relation to public health, welfare, and safety. There's no rational relationship between the decision to let these 12 stay open and these eight, or there's actually 36 others that are affected. Paragraph 26 of your complaint. The mayor continuing to act without the authority of an ordinance. This was before the ordinances were enacted. You alleged that there were some negotiations with respect to the possibility of eminent domain and for market value and so forth. Paragraph 26. The mayor continuing to act without the authority of an ordinance summarily rejected their asking price. Now, that pronoun there, does that mean all of the plaintiffs in this case? Yes. Okay. And the other similarly situated tavern owners with whom she negotiated. And then told said plaintiffs. And then, pardon me? And there's a quote. Oh, told. Then told, the mayor now speaking, because you allegedly quote her in your complaint, that the city would not pay more than $100,000 for any bar, unquote, regardless of its fair market value. Right. Now, is there any further reference to that particular allegation anywhere other than in count two where you say, maybe it doesn't count two. Hold on a second. In paragraph 45 you say, under the pretext of public health, welfare, and safety, the defendants then enacted ordinance 7-24 and 8-11 with the effect of economically, with the effect of, here's where I think you got into a bit of a problem because it's a conclusion. With the effect of economically damaging the plaintiff's properties and facilitating their acquisition by the city without paying just compensation. Well, that sort of relates back to paragraph 26. But basically what you're saying in your count two, the due process count, which he allowed you to amend it how many times? We have three. Yeah, three cracks at count two. That was the one that the trial judge anyway felt had some heft to it. Yes. And I suspect it emanated out of paragraph 26. That if she told these people, frankly, I ain't going to pay anything more than 100 grand for your places. And then you say in 28, the mayor, recognizing that these plaintiffs would not voluntarily sell, conspired with the mayor's coalition. I assume you chose the word conspired divisively. You intended that it be interpreted legally, right? Not just metaphorically. No, no, it's an agreement. Conspired to reduce the hours of operation in an adjacent to the residential domes, so that plaintiffs could not operate their businesses at a profit and would be forced to sell to the city at less than market value or close their business. And I suspect that was the paragraph where probably the trial judge kept saying, these are conclusory allegations of 28. And this is a softball for you. How could 26 be conclusory when you quote the mayor? Well, it isn't conclusory. And with regard to going on to the next one, we allege in the beginning, in the introductory point. Were there any appendix in support of paragraph 26, like a newspaper clipping or? No, no, but it's a verified complaint. And at trial, the person who heard that will get up and testify that this is what she said to me. Now, is there something criminal about saying that she's the mayor, okay, and she doesn't think that the village should ever pay more than $100,000 for any tavern in the village? Is there something criminal about that? No, nothing criminal. It's an opinion that this is just not the kind of thing that the village would spend more than such an amount for to purchase a business operating as a tavern. When a governmental entity is. I'm just asking you, is there something criminal about that statement? No, there's nothing criminal about it. The point is that when you are an entity. After she said that they're not going to pay more than this money, then you're saying she conspired with others to reduce the hours so that. Correct. At some point, the businesses would never be able to get their compensation. They would be devalued. And how and when and where did they conspire? You can't say that on information and belief or what? I can say that in an executive session that they talked about it. I can say that as a result of. You've got to look ahead to what actually happened. Where we had pled that there were five taverns that were bought at less than market value. Okay. That's the result. Didn't the trial court find some kind of fault with that allegation, too? That's why we're. Where do you get this less than fair market value when you don't have these in the complaint? In the complaint, we have alleged as to the eight plaintiffs that as a result of the ordinance and the implementation of the ordinance, their income went down and their market value went down. One of the plaintiffs said that he sold his place, his business, at a $160,000 loss. Less than. No, what you pled was that it was sold for $160,000 less than its value. Right. And a government cannot do that. You cannot take private property for an. You don't plead any facts, though, for that. That is a fact. I don't know how it is when you're simply saying it. You simply say these things and then you say these are factual pleadings when in fact they aren't. To say that the property, this other tavern that you mentioned was sold for $160,000 less than its worth, is not based on any facts. It's just a conclusion that you put in there. I mean, I know you're saying these are ultimate facts, but really they aren't ultimate facts. They're legal conclusions. That's one way that this pleading is deficient. Then you and I have a basic disagreement on what facts are. I mean, I feel that if a person gets up and says that I sold my property at $160,000, that's a fact based on his knowledge. That would never, ever be allowed in a court. The owner of a property, well, I mean. I respectfully disagree with you. Okay, but actually you could never establish the value by an owner simply saying my house is worth $700,000. I mean, excuse me, but actually you couldn't establish that by that fact. So we don't need to get onto that tangent. But the fact of the matter is that you would have to have an appraiser or you'd have to have a document that would establish that. You'd never be able to get that into court of law by someone saying, well, you're wrong. I don't mean to interrupt. I don't know any trial lawyer that would agree that you could simply get up and say my building was sold for less than $160,000. Your Honor, I've had a lot of them in domain cases. There's eminent domain law that provides that the owner of a property can get up and testify as a competent witness as to the value of his property. And that, I mean. The case that you're referring to was a very old case. It was a downstate case where a farmer came and testified to the value of his property. It isn't just one case, Your Honor. There are a number of cases that provide that an owner of property, whether it's real property or in latest research was a billboard, the owner of a billboard could get up and testify to the value. No, I agree with you. I'm familiar with those cases. But it's all based on a case that happened many years ago on a farmer talking about the value of his farm. There's nothing wrong with it. No, no, but also there was a foundation in that case. He testified that he was familiar with the value of properties in the area. Fine. Mine is not just somebody getting up there and saying that the value of my property is X dollars. You've got to be able to show that, you know, from a foundational that the person is aware of what the value of the property is. But when we get to trial, the first thing I would ask this owner is are you familiar with your property? Are you familiar with the property next door? I would lay the foundation. You don't lay foundations in complaints. You know what? I don't really have a serious concern about dismissing this because of conclusions, okay? The concern is have you established that there's something more here than what typically goes on in legislative functions that amounts to the kind of fraud that is necessary or this conspiracy. That's what I'm getting at. Forget about fraud. You know, that the allegations about the owner saying my property is worth such and such. That's really not the heart of this case. It's whether you have alleged enough to suggest this removal plan amounts to a conspiracy to deprive these owners of their property without compensation. That's the question. Have you gotten past this threshold that you need? And I think that the trial judge and I think this court has to say that beyond a doubt that there's no way that I can prove these facts. Well, without some kind of discovery. Without some kind of discovery. You've got a leakage problem, though, here, too. Let me just. You know, I think I kind of have to admit a certain admiration for your pleading. I'm talking about page 21 of your brief where you talk about. . . But you point out that if you want to exercise a due process violation, you've got to establish the depression of a specific property or liberty interest. And I suppose there you're saying I have a right to an eminent domain proceeding that's fairly conducted. If they're going to take my property, I'm entitled to an eminent domain proceeding that's fairly conducted. That's part of it. Then you've got this. . . But you also have to show that the government official's conduct shocks the conscience. Now, you've got that interesting quote in paragraph 28. You quote the mayor as saying, I'll never pay more than 100 grand for a tavern. Now, does that rise to the level of shocking the conscience? Or do you have other specific instances like that quote in your complaint someplace that we can say, this also is an indication that the conscience is being shocked? I mean, it's not enough simply to capitalize a removal plan, you know? That doesn't impress me much that you put an R or you capitalize the R and the P. I'm just trying to save pages. I know, I know. I mean, you're deftly pleading. You're a lawyer. That's what your job is. You want to get by a 2615 motion if you can.  Now, remember, the mayor is just one person. The ordinance was enacted by the entire. . . Correct. Is there any other evidence in your pleadings that indicate that anybody besides the mayor was involved in this conspiracy? The enactment of the three ordinances. Those are ordinances. All they did was reduce the hours. But. . . And you have all these cases all over the place that say they have a complete right to control the hours. And that's where Gault comes in. A municipality has a right to do something. But when they do something they have a right to do for a purpose that they don't have a right. . . But the only thing you're hanging your hat on is the mayor's subjective attitude with respect to what she thinks. No, that's the beginning. That's the beginning. Then the ordinances are the implementation, the teeth. The result is the actual purchases of five taverns at less than market value. Their plan is successful. They have deprived five people of the difference between the money they got and the value of their business, which to me is a confiscation. Do you set out the five taverns or one? We set out. . . I named the five taverns. Did you set out the other than the one who said his tavern was sold for less than. . . $160,000 less than it's worth. Did you set out any other facts about the other taverns? No, I alleged that they. . . Now is that a fact. . . That's what happened with them. And then we do have the one where we have the person with whom I was able to communicate and who was part of the pleading. And we added the specifics to his. But I have to get into proof. Did the trial court ever deny you an opportunity for discovery? No. To get from the mayor's comments to are there six older persons in the village or seven? They all voted in favor of this change, correct? Yes. Okay. Is there anything that the court prohibited you from doing in terms of trying to develop this theory that somehow her comments on the record went from that to something with these six or seven people? Only dismissed the complaint three times. All right. And, you know, we've been focusing pretty much on the due process. There are also the speech aspects of it where they are. . . By reason on the face of this ordinance, it discriminates between venues for speech. The certain venues, the B, the taverns that have the E or the right to entertainment are allowed to stay open until 2 o'clock, whereas clubs and restaurants, which also have the right to give entertainment, have to close at 2 o'clock. Now, what right does the village have or the city have to say, okay, you may speak in this venue for an extra two hours, but you can't speak over here? And there's no difference between the economic or the political or the police. These are not taverns with entertainment, though. You keep saying there's no difference. Oh, no, no, no. I'm saying these taverns are not plaintiffs in this case. The ordinance says that the certain taverns. . . In what case do you think allows you to make the complaint for those other taverns? I'll tell you. Broderick and Desnick, the overbreadth doctrine allows me, who was not affected by the ordinance, to claim. . . What was Desnick about, though? Desnick was a doctor, I believe it was some advertising, commercial advertising. . . The eye doctor? Yes, yes, yes. But the court announced that in Illinois there is an overbreadth doctrine where a plaintiff who is not affected by the challenged statute or ordinance may complain about it on First Amendment grounds as long as it's a facial attack. And this, Count 1, is a facial attack. There is a discrimination between the two types of venues in the city of Cincinnati versus discovery makes that holding that you can't discriminate between venues for speech. In that case, it was newsstands where one set of newsstands is exactly the same as those that are for advertising pieces. The advertising newsstands were not allowed, but the other ones were, and the court says you can't do that. Count 3 is equal protection or special legislation. We have these taverns that are exactly the same in every respect as far as their public impact. The secondary effects, the primary effects are exactly the same, yet they're treated differently so there can be, by definition, no public purpose. There's no rational relationship. Were there any affidavits attached to your complaint? Yes. Going back to Paragraph 21 again. Yes, there were affidavits attached, and I believe in one. . . You referenced three of the plaintiffs, Mr. Voss. Yes. I'm talking about Paragraph 21 now where you refer to the fact that the mayor contacted, initiated the contact between Voss, Lauer, and Wurzbacher. Right. Asking that, and they're plaintiffs in this case. Correct. Asking that they sell their real property to the city. Correct. And then you say kind of mysteriously in Paragraph 22, at least I find it mysterious, the mayor's negotiations to purchase, as described above, did not include payment of A, compensation for any business operated on the real property, although they were all. . . Are these places where the tavern's on the first floor and there's a residence on the second floor? Many of them are. . . Many of them are. . . Some are not. So like a mom and pop operation where dad comes down in the morning and opens the bar? Some of them are. And everybody lives upstairs? Well, I grew up in Berwyn, so I've got some knowledge of these kinds of places. And I've had drinks in Berwyn, too. Okay. All right. So I know. . . That's what you're talking about, though. It didn't include payment of compensation for the business operated, which means there must have been a residence associated with the place, too. Yes. In some instances, there were double uses. Okay. And B, fair cash market value for the real property. Right. Then you say in 23, the plaintiffs contacted, refused to sell, explaining that they were running successful businesses that were their sole source of income. Then you throw in in paragraph 24 the word retaliation, conclusion, for the refusal of them to sell and with the intention of forcing plaintiffs to remove their taverns and so forth and so on, ultimately ending up with that key paragraph 28 where she's quoted. Okay. Now, were there affidavits by Boss, Lauer, and Wurzbacher in support of these allegations? Yes. Yes. And they're appended to the complaint? Yes. Boss, I know for sure, goes into his negotiations and his contacts with the mayor. And that's appended to the complaint as an affidavit? Yes. Okay. Because I haven't that thoroughly combed the record yet. But there is an affidavit of Boss and Lauer and Wurzbacher? Yes, there are those affidavits. But I don't know about Lauer's and Wurzbacher's, what's in their affidavits. I do know Boss' affidavit from memory. Okay. That's all. Okay. I think we need to kind of move on, though. Yeah, I'll just reserve a few minutes. Okay. Is there anything you want to sum up on or do you want to wait for your rebuttal? I'll wait. Okay. Thank you, Judge. Thank you. Obviously, it's the defendant's position that everything kind of starts and ends with the Liquor Control Act. And we've heard a lot about the allegations of this plan and all these other things that people are thinking. But what was done here was the passage of the ordinance that merely made closing times for most of the taverns in the city midnight. Yeah, superficially, I don't think there's any quarrel with the right of the city to and the Liquor Control Commissioner to regulate the hours. It's a very broad police power. There's all the cases. We've cited Two Cats and Beck and Collin. In the trial court, we started there and kind of came back to that eventually, although as we're doing here today and in our briefs before you. Mr. Hayes, when can the court go beyond legislative enactments? There are situations that have been outlined that the court can do that. There are some cases that make it sound very strict that a court can't go into the legislative mens rea, I guess. But there are some that kind of suggest that there's this exception maybe for fraud and I think abuse of power. Conspiracy? Conspiracy. I think I've seen that kind of maybe pigeonholed into one of these other two, abuse of power or fraud. Well, that's what they're basically claiming here. They're not saying that this is like the cases you started out with, Beck and Collin, Two Cats or whatever. They're arguing that the reduction in hours was simply a pretext to avoid fair market value and an eminent domain. Right. Well, what count two is is a substantive due process claim, a claim that they've lost some type of right. And really nothing's been taken. They just hit the close at midnight. Well, they say that their business has been taken, that their ability to earn the kind of money they were earning before has been taken without due process, without the ability to keep that business because a group, the mayor and the six or seven older persons, conspired to not give them a fair market value for the business. And that there were negotiations that took place. The mayor and at least three of these guys had negotiations for the purchase of the property. And they were lowballed, according to the complaint. Without trying to oversimplify it again, it gets us back to the Liquor Control Act. The fact that they're not being able to run their business as they want, that they're losing profits, that does get you into the Two Cats and Beck and Collin and Black Knight. I think that the courts have said clearly that if your complaint is that you've lost some profits because you had to close a little earlier, that's not good. That's not their complaint. Their complaint is that they're being deprived of their property right without the ability to get a fair price for it, that the village is basically getting rid of these without paying for them under the process of law. Again, I know that they've tried to craft this to get around the rational basis. And that's in the trial court. We explored some of this, too. And that's where, as counsel suggested, Galt is basically his favorite case. We explored that in the trial court. And frankly, Galt in those spot zoning type cases, admittedly they say what they say, but that doesn't really apply here for a couple of reasons. Number one, in those cases, the legislative enactment that was being challenged actually changed something about the property, whether it was rezoned from commercial to residential or maybe there was the excessive setback when the legislature had previously said something three times smaller was good enough. Those directly affected the property values. I don't like hypotheticals, but what if he quoted the mayor in paragraph 28 as saying, we're going to squeeze these guys until they sell at our price? Well, frankly, I guess it's important to point out. Would that be enough? Quoting the mayor? It might help his case, but I don't think it gets him there. And even that wouldn't get him there? It's a legislative enactment. So the mayor can say pretty much anything about what her motives are and it doesn't make any difference as long as we can't go behind the legislative enactment which included, what, seven people? Right. As you suggested and said, they voted for this unanimously. No matter how outrageous the mayor's remarks might be. I think under the hypothetical you presented, it still doesn't make a difference. It still doesn't shock the conscience, even if the mayor has got this real hang-up about this saloon that's next door to where she lives. There's nothing improper, illegal, or unconstitutional in the hypothetical about not wanting taverns. In fact, the city is empowered under the state law to get rid of them altogether. In this case, the mayor didn't vote. It was unanimous from the aldermen. So there's an allegation that there's a coalition. Or a conspiracy. Everyone voted. So at least some people thought this was a good idea. Let's eliminate the vast majority of the late-night licenses. Well, not getting rid of all of them, but let's get rid of most of them. But certainly the two AMs on the residential block. My understanding is right. They're not located in the neighborhoods. There is a difference there about where they're located. And it's very reasonable for the city to say, you know, if we get closed a little earlier in the neighborhoods, it's going to resolve a lot of problems. Well, are all of these residential taverns? By that I mean are they in an area surrounded by residents? My understanding is the plaintiffs are. But the other licensees, the e-licensees, are not necessarily in the neighborhoods. They may be on the commercial thoroughfares and so forth. This doesn't involve the e-licensees, does it? No. But they're pointing at them as, especially their equal protection claim, and saying that they're getting preferential treatment. But, again, you get back to the Liquor Control Act where the state says you can make classifications, you can treat them differently, you can have different closing times, and all you need is the rational basis. Well, is the allegation that the mayor, there is an allegation in there, that the mayor spoke to all of the older men, women, whatever, and said, you know, this is what I want to do. I want to get rid of all these taverns in the residential areas. And in exchange for you passing this, I'll support whatever it is you want to do in your little wards of this city. Maybe that's an ugly side of politics and legislation, but even taking that as true, I think we cited some cases that says, even if you were to allege a conflict of interest of making promises, that that doesn't get you there. I think that the last case is the one out-of-state case. But this was a dismissal for failure to state the cause of action. This isn't a summary judgment. It isn't a trial. It's whether the court should have dismissed this on legal basis. Correct. And I think the trial judge made the right decision, that if you take all the facts, even this anti-tavern animus that's attributed to the- Are we supposed to say at this stage that this is just normal, everyday business-as-usual lobbying? Is that what the court is supposed to say? Is the trial court supposed to say that? I think based on what's pled in the complaints, the different versions of the complaints, yes, that we don't have anything that takes you past the Liquor Control Act, the rational basis. We've got in the legislatures, even local legislatures, like municipal governments, like Calumet City, a lot of wiggle room. In order for us to even think about intervening, we have to see something on the face of the complaint that shocks the conscience. If we're going to entertain a due process argument that the legislative enactment violated due process, not only because it deprived you of the possibility of a fair price for your property in an eminent domain proceeding,  but it also has to shock the conscience. Well, I addressed that in our brief, Justice Cahill, that the Carabazos and the Dennis E. v. O'Malley cases are executive actions versus legislative. So I haven't seen the shock the conscience test applied to the legislative. To a legislature, no. We tend to treat the legislative enactment like a hot stove, unless it has something to do with. Right, it's those two cats cases and beckoning calls. So respectfully, I don't think that the shock the conscience test really comes into it, although I know they fled in certain versions of their complaint. They started characterizing things as shocking to the conscience to, again, try and get around this rational basis test. But I don't think that that applies, regardless of the conflict between the first district and the second district on what that standard is. But, again, their whole argument, again, gets back to this, we've lost profits, therefore our business is failing, therefore our real estate is failing, therefore the city is going to buy us. And this was all deliberately conceived by the city in order to deprive us of the fair market value of our property. That's the ultimate predicate. That's the allegation. But everything is on those lost profits. Again, I hate to. Well, what about that statement of the mayor? Does she have the right to say, you know, I'll never pay more than $100,000 for a tavern? Whether you think it wise or unwise, she has the right to say it. And it's not illegal or unconstitutional. She's not voting on the ordinance. What is illegal about her saying that, you know, we're not going to pay more than $100,000 for a tavern? Because we don't really think that any tavern is worth that in terms of the village paying more than that amount of money. Maybe she thinks there's better things to be spending $100,000 on. I can't get past what is the. It's not improper for the mayor or the city. Is it improper, though, for the mayor to conspire or get these other older persons to agree that in order to make sure that we don't have to pay $100,000, we're going to cut these out? Now, is there something shocking about that? Under those facts, you know, that gets you maybe closer. Well, that's kind of what I think the complaint says. It's trying to say anyway. I think it's trying to say that, yeah. I still think that you get back to is the ordinance, and you have any conceivable validity to it. Is there some legitimate government purpose here? I think everybody here concedes that there's a rational basis for always cutting tavern hours. Right. That's not where we are. And the Liquor Control Commission has enormous power when it comes to regulating the behavior of licenses. But, yeah, the anti-tavern animus attributed to the mayor, let alone even if she wanted to do that, maybe if we're talking bribes or something like that or falsifying votes somehow, maybe that gets into that case. You're basically saying a single quote like that certainly can't form the predicate for a conspiracy. I don't believe so, not without more, not on the basis of that hypothetical. Well, he's arguing that there is much more. I mean, he's got affidavits from the people who were approached and actually negotiated with the mayor for the sale of their property, and they all allege they got lowballed. And immediately after they rejected the lowball, here comes the ordinance which cuts their hours and their profits. But, you know, in my reading of the complaint, there's nothing in there that suggests anything other than arm's length dealing between most of those people. They say that one is a plaintiff, but most of them are not plaintiffs. Yeah, but we're supposed to read a complaint, you know, particularly when it's faced with a 2-6-15 motion to dismiss. We're supposed to give the pleader the benefit of the doubt. And I don't think there's anything to suggest that in the complaint that there's anything other than the conclusion that we got ripped off, that, you know, they sold their property to the city, the city purchased it. There's no getting around what happened, but there's nothing to taint that that's in the complaint. Anything else you want to stress? We've read your briefs. I think that's it. We've mostly concentrated on count two, and obviously we'll stand on that. Well, I think he's concentrated on count two, just the way he's shaped his – I'll let him speak for himself, but the way he's shaped his brief, it's clear that he's focusing in on that area. But he may have another thing he wants to say about that. No, I think that's all that I have to add. Thank you, Mr. Hayes. No, your brief was very helpful. Mr. Weber, you have the last word. Thank you. I want to go back to that comment where the mayor says we won't pay more than – there's nothing illegal about that, as we discussed before. But the problem is when you implement it, with her position as the head of the political coalition out there and as the local Liquor Control Commissioner, where they enact the ordinance that ultimately damages the value of the businesses and then comes along and starts buying up the devalued businesses. And as local Liquor Control Commissioner, she gives two of the B licensees, allows them to move into the BE category. I would point out that the cases that I've relied on, and a couple in one of the cases that the city relies on, Galt, Exchange National Bank, Vodum, and AAA were all trials, or at least extended evidentiary hearings. In Galt, a Supreme Court case, they rely heavily on the statement of the Chairman of the Plan Commission of the Cook County Plan Commission. And it's a planning board. So when you're looking at mens re, the city said you could only look at the motives of the alderman and the mayor in cases of fraud, but the cases are very clear that you can go for abuse of power. And in Galt, there was no allegation of fraud or abuse of power, but they quoted the chairman as putting some definition on what the county was doing in broadening the setback. Mr. Weber, is your connection between the mayor and the voting alderman basically that because she, that there was a majority of those aldermen that supported her gender or something that therefore that was the conspiracy? No. How do you get from her statements that, you know, as far as I'm concerned, we're not going to pay $100,000 for any, more than $100,000 for any tavern? How do you get from that to this legislation that somehow that statement, where are the pieces to get from her statement? To me, it's an ultimate fact that she is the. That you can infer that these others conspired with her because they passed legislation after the period of time that she made those statements? I guess I have not put down all the votes where the alderman has sat down with the mayor or the mayor has talked to the alderman and says, okay, I am your leader and you are my followers or vice versa. I think that's what you're looking for is some type of. Yeah, is there a possibility that you've got a hole here or not? I mean, I don't know how you get from her statements that we're not going to pay more than $100,000 for any tavern in this town to these six older people voted to cut the licenses to effectuate that removal plan. To cut the licenses for some people and then the acquisition of the B licensees of the five and then the one other that's a plaintiff in this case at less than the value of paying them less than they were worth. That's the problem here. And the problem is also shocking the conscience. The shocking the conscience is the fact that this is ongoing. It's a continuing operation that started with a plan, was implemented with an ordinance, has resulted in purchases and is ongoing. What do they want these properties for? That's what I'm getting. I agree with that. We don't know. There's no ordinance. There's no comprehensive plan. That would be a discovery. That would be the first thing I'd say. What's the public purpose for you buying all these properties? Why are you spending the people's money to buy these properties? Well, it could be just a temperance crusade going on. There's nothing wrong with that. It's totally spec. Well, maybe there is something wrong with it. The case is whole that even if you were to eliminate all taverns, all liquor licenses, there has to be a public purpose. It has to have some rational relationship. We don't see it. You don't see it. No, there's always a rational basis for cutting tavern hours. There's cases all over the map, all over the country. So, yes, there's always been a rational basis for that. If you do it fairly across the board and you don't discriminate, as soon as you start to discriminate, you better have another good reason for making those choices which they don't have here. But if you have a legislatively enacted plan, you know, you call it a plan. It's all over a conspiracy. But you have a legislative plan which is really nothing more than a temperance crusade in response to the majority of the folks living in the community. You're not going to see a court intervene with legislative enactments which are based on a temperance crusade. It goes on all the time. But we don't have a legislative enacted plan here. We have a plan that was conceived in secrecy. Well, I know. That's your allegations and your complaint, and that's ultimately, I guess, where we have to come down as to whether or not you successfully pled it to the extent that it can survive a motion to dismiss. Leslie, you say that there's some difference. Now, before this ordinance, I thought all these Class B taverns stayed open until 2. They could stay open until 2 and serve liquor. Is that right? All liquor licensees, yes. It's correct. All liquor licensees could stay open until 3 until July 1st of 2008. Then on January 1st, 2007, 2008, then they made the distinction between some staying open until 2 and most others closing at midnight. Well, when you say most others, weren't they the former B taverns? No. Clubs, restaurants, packaged goods stores, and B taverns. Okay. So they all have to shut their liquor sales at midnight. Except the 12. That are entertainment licenses, right? But we have pled there's no difference between them as far as the impact. Even though you've pled there's no difference, that doesn't mean there's no difference. Okay. One is called a tavern with entertainment or a license with entertainment. We have done more than plead the conclusion. We have said that statistically, as far as police calls, as far as depreciation of property, as far as complaints, litter, urination, and so on, that there is no difference, so there should not have been a distinction. Okay. Finally. Yes. Counsel just mentioned that we have not pled a loss of any rights as far as the due process. We have pled a loss of both property and liberty rights, which are the foundation for the speech for due process and equal protection. It's all explained. I thank you, and I ask you to please reverse. Mr. Hayes, Mr. Weber, thank you both. The case will be taken under advisement.